UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

LIZA C. ARIZA,

                    Plaintiff,

v.                                                          Case No. 3:13-cv-00419-JWD-SCR

LOOMIS ARMORED US, LLC,

                    Defendant.

**ORDER AND RULING ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Before the Court are Defendant Loomis Armored US, LLC's Motion for Partial

Summary Judgment ("MSJ"), (Doc. 51); Plaintiff's Opposition Memorandum to Defendant's

Motion for Partial Summary Judgment ("Plaintiff's First Opposition"), (Doc. 54); and three

copies of the same motion—Defendant's Reply Memorandum to Plaintiff's Opposition

Memorandum to Defendant's Motion for Partial Summary Judgment ("Defendant's Reply

Memorandum"), (Doc. 58, 60, and 63). Three others touch upon the arguments discussed therein:

Defendant's Proposed Memorandum in Support of Motion for Leave to File a Supplemental

memorandum in Support of Motion for Partial Summary Judgment Filed by Defendant Loomis Armored US, LLC to Dismiss Plaintiff's Claims Pursuant to the Americans with Disabilities Act (ADA) for Failure to Set Forth a *Prima Facie* Case That She has a Disabling Condition of Epilepsy and/or Seizures [Doc. #51] ("Defendant's Proposed Memorandum"), (Doc. 110); Liza Ariza's Opposition Memorandum to Defendant's Supplemental Memorandum to its Motion for Partial Summary Judgment ("Plaintiff's Second Opposition"), (Doc. 111); and Defendant's Proposed Reply Memorandum to Plaintiff's Opposition to Loomis's Supplemental Memorandum in Support of Motion for Partial Summary Judgment to Dismiss Plaintiff's Claim Pursuant to the Americans with Disabilities Act ("Defendant's Second Reply"), (Doc. 114). In the MSJ, as supported by its other related filings, Loomis Armored US, LLC ("Loomis" or "Defendant"), has moved for summary judgment against Ms. Liza C. Ariza ("Ariza" or "Plaintiff"), a former employee who has sued Loomis for discrimination on the basis of a specific disability: a type of chronic seizure disorder, possibly embraced in full by the clinical term "epilepsy."

 Pursuant to Federal Rule of Civil Procedure 56,[1] Defendant's MSJ must fail primarily because Defendant has rested its motion on an incomplete construal of the disjunctive "definition of disability" set forth in the Americans with Disabilities Act of 1990, as amended in 2008 ("ADA"). While a person qualifies as disabled if he or she suffers from a recognizable and verifiable impediment, the ADA does not constrict its definition so exactly. In fact, it encodes a third definition traceable to this act's ameliorative and expansive intent. Under this third possible denotation, Plaintiff does not need to prove a disability's existence or provide a record so attesting to qualify for its protection; instead, so long as Plaintiff can later show Defendant perceived her to be disabled and terminated her due to its belief regarding the ramifications of

---

[1] In this opinion, any and all further reference to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

this disability, she is "disabled" within the ADA's broad parameters. As the evidence, construed in the nonmovant's favor, does not discount this third possibility as a matter of law, the complaint must, at present, survive. Notably and significantly, this result would follow even if every assertion that Defendant makes in the MSJ—an utter dearth of decisive proof of a disability's actuality in this case's factual record and an unbelievable Plaintiff and mother—is assumed to be incontrovertibly true.

Here, however, the factual evidence is not so crystal-clear. Rather, in advancing this unqualified assertion, Defendant obscures and exaggerates the manifold inconsistencies and omissions in Plaintiff's medical evidence. In particular, Defendant makes too much of two doctors' testimony in each and every filing, but these men's accounts are rife with discrepancies that may convince a jury to disregard their most recent—and movant-favoring—testimony. Viewing the record as a whole, then, as Rule 56 compels this Court to do, key material facts remain unsettled, and a reasonable factfinder may readily disbelieve much that Defendant now characterizes as irrefutable verities. In fact, more than a scintilla of evidence can still be assembled so as to create a pro-Plaintiff case as to, among other matters, Defendant's perception of Plaintiff's medical state and its good-faith efforts at accommodating Plaintiff's assumed disability. Thus, when the record is actually considered in full, with only unimpeachable and unquestionable evidence branded as fact, a victory for Plaintiff can still be reasonably envisioned.

As such, for these reasons, as more fully explicated below, the MSJ is DENIED.

## II.    BACKGROUND

### A.    Introduction

This case began with a complaint filed on June 28, 2013 ("Complaint"). (Doc. 1 at 1.)

Once a driver and a vault supervisor for Defendant, Plaintiff sued Loomis, her last employer, for

violations of five statutes: the ADA, 42 U.S. § 12101 *et seq.*, and Louisiana's state equivalent,

LA. REV. STAT. ANN. § 23:322 *et seq.*; the Family and Medical Leave Act of 1992 ("FMLA"), 29

U.S.C. §§ 2601-2654; and the Civil Rights Act of 1962, 42 U.S.C. § 2000 *et seq.*, and its own

Louisiana parallel, LA. REV. STAT. ANN. § 23:322. (Doc. 1 at 1) Her allegations distilled, the

Complaint requests monetary and injunctive relief for "unlawful discrimination in employment"

on the bases of "disability, sex, and retaliation." (Doc. 1 at 1–2.)

### B.    Brief History

Defendant hired Plaintiff on February 18, 2008, as a guard for one of its armored trucks.

(Doc. 1 at 3; *see also* Doc. 51-1 at 3.) Allegedly, Defendant suffered a seizure in September 2008

during her shift. (Doc. 1 at 3.) Another supposedly struck her at home in December 2008. (*Id.* at

4.) After a Dr. Wissner told Plaintiff she could no longer work as a truck driver, Defendant

reassigned Plaintiff, and she started working as a custodian within one of Defendant's money

vaults. (*Id.*) In 2009, Plaintiff again began working as a guard, a gun worn daily. (*Id.*) Later, she

obtained a full-time position as "a 17 Vault Supervisor." (*Id.* at 5.)  On June 5, 2012, Plaintiff

purportedly suffered a third seizure ("Incident"). (*Id.* at 6–7.)

After the Incident occurred, for which Plaintiff was hospitalized, she was examined by

Dr. William W. Gladney, Jr. ("Dr. Gladney" or "Gladney"), a neurologist. (*Id.* at 7.) In June

2012, Dr. Galdney conducted a magnetic resonance imaging ("MRI") scan and an

electroencephalogram ("EEG") test; the results were normal. (*Id.* at 8.)  Dr. Galdney also spoke, with Plaintiff's permission, to her primary care physician, Dr. Bruce Craig ("Craig" or "Dr. Craig"), "about her physical condition." (*Id.*) On June 12, 2012, Dr. Gladney signed a release authorizing Plaintiff to recommence her employment as a vault supervisor. (*Id.* at 7.) Seemingly, in spite of this doctor's written approval, Ms. Susan Robinson, Plaintiff's supervisor, refused to sanction Plaintiff's return, the Parties disputing the precise motive. (*Id.*)

Eventually, Plaintiff sought leave under the FMLA. (*Id.*) Defendant approved a leave period of June 5 through August 7, 2012. (*Id.*) During this time, Plaintiff underwent sinus surgery and provided Defendant with a note from a new doctor, Dr. Charles F. Mitchell, stating that she could return to work. (*Id.* at 8–9.) Despite this authorization, at Defendant's insistence, Plaintiff went to see another doctor, Dr. Uzoma Moore ("Moore" or "Dr. Moore"). (*Id.* at 9.) Dr. Moore found Plaintiff "unable to perform essential functions"; though he wrote "No medical restrictions," he added, "Pending-Medial Hold" and "Needs Clearance," to his official report. (*Id.*) Dr. Moore asked Plaintiff to have Dr. Craig forward "paperwork documenting his finding that she was able to return to work"; Plaintiff promised to do so. (*Id.*)  Dr. Craig confirmed Plaintiff's diagnosis during a phone conversation with Dr. Moore. (*Id.*)

Both due to Dr. Moore's examinations and Defendant's demand that she undergo more testing, Plaintiff did not return to work after August 27, 2012, the extended expiration date of her FMLA leave period. (*Id.*) Throughout September 2012, Defendant repeatedly directed Plaintiff to Dr. Moore for further examination. (Doc. 54 at 7–13.) Frustrated by these demands, Plaintiff filled and filed an intake questionnaire for the Equal Employment Opportunity Commission ("EEOC") against Defendant, and the EEOC mailed Defendant notice of Plaintiff's "unperfected charge of discrimination" on October 5, 2014. (Doc. 1 at 9.) Its receipt of this notice

unestablished, Defendant terminated Plaintiff on October 11, 2012. (Doc. 54 at 12.) In this termination letter, Defendant cited Dr. Moore's refusal to release Plaintiff on the basis that her job required a gun be carried, this ability deemed "essential." (*Id.* at 12.)

Three different doctors consistently reappear throughout this tale and in nearly every pertinent motion: Gladney, Plaintiff's neurologist, who both saw her personally and was deposed by Defendant; Craig, apparently her longtime primary care physician who also testified at a deposition; and Moore, a specialist contracted by Defendant and to whom Defendant directed Plaintiff so as to procure her official and final clearance. (Doc. 1, 51-1, 54-1, 110, 111, 114.)

## III.   PARTIES' ARGUMENTS

### A.   MSJ

In the MSJ, Defendant insists Rule 56 compels its motion's full success for one overarching reason: "Plaintiff has failed to provide a scintilla of evidence that she has a disabling condition of epilepsy/seizures and she has shown no evidence whatever that she is substantially limited in any major activity." (Doc. 51-1 at 3.) By choice, therefore, Defendant has narrowed the Court's inquiry: Defendant "respectfully submits this motion for partial summary judgment to dismiss plaintiff's . . . claims pursuant to the Americans with Disabilities Act (ADA) for failure to set forth a prima facie case that ***she has a disability***." (*Id.* at 1 (emphasis added); Doc. 51-1 at 1.) For support, Defendant points to four items of evidence indicating Plaintiff's want of a requisite disability: (1) her treating physicians, Doctors Craig and Gladney, "have specifically testified that she does not have a disabling condition"; (2) "there are no medical records wherein a physician and/or physicians have ever diagnosed [her with] epilepsy or seizure activity"; (3) no evidence of such a disability appears in her post-high school employment records; and (4) her

file at the Office of Motor Vehicles is similarly bereft. (Doc. 51-1 at 3.) In fact, with discovery

having concluded, the only evidence that Plaintiff suffers from an epileptic condition are

"unsubstantiated statements made by Ms. Ariza that she has epilepsy and seizure." (*Id.*) As such,

Plaintiff has failed to make, as Rule 56 requires, the *prima facie* case that she suffers from a

disabling condition. (*Id.* at 2.)

### 1.    *Records' Review*

Initially, Defendant points to Plaintiff's work-related records. The MSJ first takes up

Plaintiff's examination by Dr. J. Louis Tonure, Jr., undertaken by Plaintiff so that she could

obtain her commercial driver's license. (*Id.* at 3.) To this physician, Plaintiff recounted a "history

of two seizures," "possible" and not "definite" in the doctor's words, but she stated she had

"never been prescribed medication for these alleged seizures" and did not acknowledge herself to

be epileptic. (*Id.*) Even her non-commercial driver's license evidenced no restrictions

traditionally appended in regards to those suffering from seizures generally or epilepsy

specifically. (*Id.*). To this point, Defendant returns in the MSJ's later paragraphs, citing to

Plaintiff's applications for a driver's licenses issued on three separate dates—June 27, 2003;

February 2, 2007; and October 10, 2011—in which she checked "no" when asked about any

prior experiences of "loss of consciousness other than normal sleep" and otherwise did not

affirmatively indicate the existence of any physical or mental condition significant enough to

impair her ability to drive. (*Id.* at 5–6.) In her employment application to Loomis, Plaintiff again

did not identify herself as disabled. (*Id.* at 4.) Earlier employment records, subpoenaed by

Defendant during discovery, evince a similar absence, not one referencing "any accommodation

for alleged seizures." (*Id.*)

Next, Defendant argues from Plaintiff's subpoenaed medical records. Allegedly, Plaintiff suffered a seizure while in the military's employ, but "the records do not reflect any such incident," containing "no mention of any seizure, syncopal episode, or fainting." (*Id.* at 8.) When she was seen on December 26, 2003, at the Huey P. Long Hospital, she complained of a syncopal, i.e. fainting, episode, but she did not seek any medical attention or receive a prescription of any kind. (*Id.* at 6–7.) Without reference to authoritative medical sources, only the testimony of Craig and Gladney, Defendant states: "A syncopal episode means fainting, it is not epilepsy or seizures, it is simply fainting." (*Id.* at 7.) Apparently, "Drs. Craig and Gladney agree with the diagnosis of two fainting episodes and that plaintiff has no disability." (*Id.*)

Another fainting spell—or seizure—occurred on or about August 30, 2007. The records of the Baton Rouge General Medical Center ("BRGMC") documenting this incident "note that . . . [Plaintiff] had blurred vision and passed out, symptoms of fainting not epilepsy." (*Id.*) Her doctor at the time, however, once more diagnosed a fainting spell and chose not to prescribe anti-seizure medication for Plaintiff's future use. (*Id.*) EEG and x-ray computed tomography ("CT") scans were performed, each apparently normal, and "[t]he discharge instructions give a diagnosis of syncopal episode (fainting), not epilepsy or seizure activity." (*Id.* at 8.) The same result followed after another fainting spell and another admission to BRGMC on September 9, 2008: "Drs. Gladney and Craig testified in their depositions that the[] symptoms [recorded on this September record] are not epilepsy or seizure." (*Id.*)

### 2.    *Doctor's Deposition Testimony*

Defendant begins with Gladney, "the sole physician who would testify that she had a severe epilepsy disorder" by Plaintiff's own admission. (*Id.* at 13–14.). At his deposition,

Gladney reviewed the record of Plaintiff's hospitalization on August 30, 2007; it indicated a "normal EEG and a normal CT scan of the brain," "no tongue biting," "no tonic/clonic movement," and a general "symptomology of blurred vision." (*Id.* at 11.) When asked for the first time to review this record in the midst of his deposition, Gladney deduced that this was "a fainting spell and not a seizure." (*Id.*) In this testimony, he specifically highlighted the "no tonic/clonic movement" phrase, maintaining that it revealed the treating physician's belief "that he doesn't think it's a seizure." (*Id.*) Dr. Gladney said the same about Plaintiff's other alleged episodes: that Plaintiff had suffered through a fainting spell alone; the EEGs performed were normal; and that her actions in the Incident's immediate aftermath, including sipping water to leaving her head on the table to crying, were inconsistent with any seizure. (*Id.* at 12–13.) Though the Incident consumed much time, Plaintiff's written records led Gladney to state under oath "that Ms. Ariza is not disabled in any manner whatsoever" and "does not have a disability at all which would affect or limit her social or work life." (*Id.* at 13.)

The MSJ then turns to Dr. Craig, his testimony further "negat[ing] Ariza's allegations that she has a disability due to epilepsy and seizures." (*Id.* at 14.) A family physician, Craig evaluated Plaintiff when she was young. (*Id.*) At the time, Craig diagnosed Plaintiff with a "fainting spell"; he did not order an MRI "because she did not have seizures"; and he never "refer[red] her to a neurologist" and himself "conducted no tests." (*Id.* at 15.) His records' reference to "seizures" reflected not medical analyses but a digest of Plaintiff's self-told history, a wholly "unsubstantiated" account that he did not question or regard as absolutely credible. (*Id.* at 15, 16, 17) At present, moreover, Craig does not believe Plaintiff was disabled "during the period of time he saw her in her childhood to this day." (*Id.* at 16.) Yet, in an affidavit dated March 6, 2014, Dr. Craig opined that "Ariza suffers from a seizure disorder," one he described as

"under control." (*Id.*)

### 3.    *Absence of Discriminatory Motive*

In the MSJ's final pages, Defendant makes a new argument: "[P]laintiff has failed to show any discriminatory or retaliatory actions on the part of Loomis," with "all of the evidence and testimony show[ing] that Loomis bent over backwards to assist Ms. Ariza in obtaining a medical release back to employment." (*Id.* at 17.) To support this argument, Defendant claims Plaintiff "refused to cooperate with being evaluated by a neurologist of her choice in order to get a clearance back to work," a doctor to be paid by Loomis alone. (*Id.*) Above all, Plaintiff never obtained the precise documentation requested by Dr. Moore so as to permit a complete analysis of her true handicap. (*Id.* at 17–18.) Later, Defendant would again advise Plaintiff that she needed to see a neurologist, one for which it would pay, in order to gather "medical information indicating that she could safely perform her job duties with or without accommodation," conduct described as "prudent" by Dr. Gladney himself. (*Id.* at 19.) The MSJ also emphasizes that Dr. Moore assumed that a gun was absolutely essential for Plaintiff's position, a condition set by Defendant and openly communicated to Plaintiff.  (*See id.* at 18–19.)  Overall, as Defendant steered Plaintiff to a neurologist and offered to pay for any such evaluation, it "in no way discriminated against Ms. Ariza." (*Id.*)

### 4.    *Conclusion*

As this summary shows, the MSJ focuses its attention on one issue: whether or not the Plaintiff has a proven disability. (*Id.* at 20.) No more is directly contested, only her "standing to

bring a claim under the ADA" on the basis of a proven disability.[2] (*Id.*) Due to this lack of

evidence, Defendant closes, "there is no material fact in dispute." (*Id.*)


**B.     Plaintiff's First Opposition**

Plaintiff's First Opposition argues that Plaintiff is "indeed disabled" under the ADA and

that summary judgment is therefore improper. (Doc. 54 at 1.) Though not so tightly organized,

for ease of reference, this Court construes it as two parts. The first part attempts to marshal

affirmative evidence that Plaintiff is disabled. This motion's second part attacks the MSJ's

interpretations of the evidence unearthed, essentially highlighting its supposed deficiencies.


*1.      Affirmative Arguments*

Plaintiff makes five central arguments to solidify her contention: over a lifetime, she has

long lived under a seizure's menace, though the disease itself has struck her "infrequent[ly]" and

could "be controlled by medication." (*Id.* at 2; *see also* Doc. 54-1 at 8.)

First, because "Ariza has not been entirely honest with all employers and the State

Department of Motor Vehicles regarding her seizures," those empty records should not be

accorded undue weight at this summary judgment stage. (Doc. 54 at 2.) She has lied beforehand,

this defense implies, but that admission should not divert the Court from the ADA's broad

definition of disability. In other words, while such a past, if not controverted at trial, may raise

---

[2] Though the meaning is clear, Defendant here imprecisely utilizes the term "standing."
Technically, the doctrine of standing deals with a court's own jurisdiction to adjudicate a
particular person's case. *See, e.g.*, *Elk Grove United Sch. Dist. v. Newdow*, 542 U.S. 1, 11, 124 S.
Ct. 2301, 159 L. Ed. 2d 98 (2004); *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir.
2004). In contrast, a plaintiff without a cognizable disability, as defined in the ADA, lacks a
claim under the statute, not the standing to contest the merits. *Cf. EEOC v. Tex. Bus Lines*, 923 F.
Supp. 965, 970 (S.D. Tex. 1996).

questions about her present allegations' credence, it does not conclusively prove more than an absence of documentation for her alleged claims, and it does not in and of itself disprove her disability. Here, Plaintiff attributes this lack of candor to her circumstances "as a single mother . . . [who had to make] decisions . . . to ensure employment and a license to get . . . to work." (*Id.*)

Second, Plaintiff contends that she did tell previous employers of her disability. (*Id.* at 2–3.) She offers as examples a Capital One interviewer, a recruiter with the Louisiana National Guard, and a supervisor, Ms. Bess Franklin, with Pro-Lending Staffing. (*Id.* at 3.) The fact that there is no overwhelming documentary evidence to buttress this claim, she maintains, is not yet fatal to her case. (*Id.*)

Third, at least some persons described the Incident in a manner consistent with a seizure. (*Id.* at 4–5.) Plaintiff points to the written accounts of Ms. Stacie Robinson and Mr. Robert LaFolette, her former supervisors. (*Id.*) Texts sent by the latter are also cited as supporting evidence. (*Id.* at 5.)

Fourth, Plaintiff maintains that she diligently followed Defendant's good-faith instructions, obtaining the required clearance prior to her attempted return. When Defendant asked for a test by a neurologist, she got one from Dr. Gladney, a neurologist, who later released her to return to work. (*Id.* at 5–6.) When Dr. Moore, Defendant's chosen doctor, requested information from her prior doctors, she readily offered Dr. Craig's contact information. (*Id.* at 7.) She even provided Dr. Moore with a release allowing him to speak with her every doctor and peruse her every record. (*Id.* at 9.) In the end, Plaintiff did submit "return-to-work statements from three doctors," thereby providing "medical information stating it would be safe for her to return to work." (*Id.* at 12.) At least one email, Plaintiffs contends, reveals that Defendant considered terminating Plaintiff on September 14, 2012, though Dr. Moore had not yet obtained

the documentation he requested. (*Id.* at 10, 101.) In Plaintiff's retelling, with arguably one exception, she conscientiously solicited the opinions of three different doctors, none of whom posed any objection to her imminent return to a Loomis vault. (*Id.* at 11, 12.)

In her fifth contention, Plaintiff argues that emails exchanged by Defendant's various employees and these officials' resulting conduct reveal a "strategy to blame Ariza for Loomis refusal to return her to work." (*Id.* at 6.) For example, Defendant's employees encouraged Plaintiff to take FMLA leave and demanded she provide paperwork from the doctor who performed her sinus surgery. (*Id.* at 6–7.) Seemingly, one official, Ms. Rebekah Jackson, "warn[ed] the Baton Rouge Loomis branch that Ms. Ariza may try to show up for work." (*Id.* at 7.) In the ensuing days, even as Plaintiff sought to resume her interrupted professional life, she received only "unfriendly" attitudes from various Defendant officials, including Ms. Jackson once more and Ms. Elizabeth Calloway. (*Id.* at 8–9.) Tellingly, Defendant apparently provided two different job descriptions to Dr. Moore: the first did not list a weapon as a requirement, but a second iteration quite clearly did. (*Id.* at 9, 100, 103–04.) And though "three doctors had . . . approved . . . [Plaintiff's] return to work four times," Defendant still resisted, choosing not to "open[] up the discussion [about possible accommodation] to Liza and Loomis supervisors" or to "brainstorm[] on possible accommodations to forego instances where a weapon is normally required." (*Id.* at 11.) Even Dr. Moore, Plaintiff argues, eventually tendered a qualified refusal, not the absolute one described in Defendant's MSJ: "He concluded that employees ***could*** work in that environment[, one 'where firearms are involved while having to respond to potentially dangerous situations,'] but only if the employee had been seizure free for some time and no longer at risk for a seizure." (*Id.* at 11 (emphasis added).)

### 2.      *Attacks on MSJ's Reasoning*

Plaintiff commences by stressing Defendant's reliance on the ADA's formerly strict definition of "disability," expanded in 2008. (*Id.* at 16–17.) Relatedly, she insists, a court's focus must be not on the existence of a disability but on "whether the covered entities have complied with their obligations and whether discrimination has occurred." (*Id.* at 16 (quoting *Garner v. Chevron Phillips Chem. Co., L.P.*, 834 F. Supp. 2d 528, 538 (S.D. Tex. 2011)).) As this ameliorative law should not be so narrowly read as to dismiss a complaint supported by at least some evidence, Plaintiff's own complaint should survive, her occasional seizures physically limiting when in an active state and thus comprehended by the ADA's definition if "construed as broadly as possible." (*Id.* at 16, 17.)

Plaintiff then launches a three-pronged attack on the MSJ. First, she insists she does have a disability, citing to a history of thinly documented seizures and a diagnosis of epilepsy by Dr. Craig (and a prescription of anti-seizure medicine).[3] (*Id.* at 19–21.)  She has had, she insists, "seizures as an adult in 2003, 2004, 2006, 2008 (two), 2010, and 2012." (*Id.* at 18.) She argues that the numerous assertions in the MSJ are "false," from what she told her former employers to what Gladney and Craig actually meant in their depositions to her prescription history. (*Id.* at 21–23.) Without citation to an authoritative medical source, she voices a common complaint— "that doctors order too many tests to diagnose patients' illnesses"—and observes: "Diagnosing [epilepsy generally or a seizure particularly] is difficult as the person must be undergoing a seizure for the test to find seizure activity which, in Ms. Ariza's case, only occurs infrequently." (*Id.* at 19.) Second, Defendant did not truly accommodate Plaintiff, as it insists, (Doc. 51-1 at 17–19). Instead, it did the very opposite when it chose (1) not to offer her with an

---

[3] Defendant, of course, had argued differently, though Plaintiff's First Opposition does at least produce her insurance profile from Walgreen's. (Doc. 54-1 at 20.)

accommodation, though one could have been provided without unduly burdening Defendant and without sacrificing any of her job's essential functions, and (2) not "[to] engage in interactive discussion" with Plaintiff about how to do so. (*Id.* at 24.) In this vein, Plaintiff contends that the ability to use a weapon is an inessential aspect of the vault supervisor position, for "[i]t would not be necessary for the vault supervisor to wear a weapon as other workers' weapons could suffice," and Plaintiff stresses that Defendant left Plaintiff mostly uninformed about the precise information it desired to ensure her medical clearance in August and September 2012. (*Id.* at 25–27.) Third, since Defendant did regard Plaintiff as disabled, a belief reflected by its various recorded employees' comments, Plaintiff could not legally be fired so long as she could perform her job's essential functions under the ADA, broadly understood. (*Id.* at 29–30.) She could perform those functions even without a gun, she remarks, and Defendant's actions therefore ran afoul of the ADA. (*Id.*)

## C.   Defendant's First Reply

Defendant's First Reply entirely reiterates the MSJ's prior points. Thus, it argues that "Plaintiff has failed to present any evidence through a qualified treating physician or diagnostic testing that she has epilepsy and/or seizures and that she has any impairment that substantially limits any major activity"; "[s]imply stated, "there is no medical diagnosis that supports Plaintiff's claim that she has seizures or epilepsy, and hence her entire claim should be dismissed." (Doc. 58 at 1; Doc. 60 at 1; Doc. 63 at 1.) Once more, Defendant writes: "Based upon the evidence adduced to date, [P]laintiff has a sporadic history of dizziness and vertigo, but never a diagnosis of seizures or epilepsy." (Doc. 58 at 1; Doc. 60 at 1; Doc. 63 at 1.) Once more, Defendant cites to the deposition testimony of Plaintiff's own treating physicians, in which both

doctors averred to the absence of epilepsy's proof and a history of apparently normal medical tests. (Doc. 58 at 2–3, 5–7; Doc. 60 at 2–3, 5–7; Doc. 63 at 2–3, 5–7.) Once more, Defendant points to Plaintiff's employment record, with no disability mentioned, and attacks Plaintiff's alleged reasons for this discrepancy. (Doc. 58 at 3–4; Doc. 60 at 3–4; Doc. 63 at 3–4.) And once more, Defendant ends by insisting that "Loomis never acted in a discriminatory or retaliatory manner." (Doc. 58 at 7–8; Doc. 60 at 7–8; Doc. 63 at 7–8.) Regardless of how the record may be sliced and diced, Defendant's conclusion remains constant: "Plaintiff has not presented a scintilla of evidence to meet her burden that she has seizures/epilepsy, and that this alleged condition is disabling" as defined by the ADA, (Doc. 58 at 8; Doc. 60 at 8; Doc. 63 at 8.)

### D.      Defendant's Proposed Memorandum

Defendant's Proposed Memorandum recaps prior reasons: "[I]nalterable facts and evidence . . . prove plaintiff Ariza has not established that she has a disability under the Americans [w]ith Disabilities Act." (Doc. 110 at 1.) Once more, it stresses the record's barrenness: "In all of the medical records identified by [P]laintiff, military records, employment records, deposition testimony of Drs. Bruce Craig and William Gladney, there is no provable evidence of seizures or epilepsy," Plaintiff's own "self-serving testimony and that of her mother" alone crediting her with a disability. (*Id.* at 1, 3) Nonetheless, Defendant's Proposed Memorandum does add something to the existing record. Touching upon the matter briefly in the motion's main body, (*id.* at 1), it includes Plaintiff's United States Army records from Fort Jackson as attachments. These records show no disability and even include a questionnaire, signed by Plaintiff and her mother, disclaiming any possible disability, throwing both persons' credibility into question. (Doc. 110-1.)

**E.      Plaintiff's Second Opposition**

Plaintiff's Second Opposition emphasizes this Court's duty to consider all "new and earlier evidence" to divine whether a reasonable trier of fact "could reasonably conclude that . . . [Plaintiff] was disabled." (Doc. 111 at 1.) Enough evidence exists for this conclusion to still be possible, as "Ms. Ariza and her mother stated that . . . [she] has epilepsy" and her "physician was convinced of her epilepsy" sufficiently to "prescribe[] medication for it." (*Id.* at 2.) A physician who allegedly reviewed another's notes about the Incident and watched its video recording did not wholly discount the possibility of a seizure, remarking that "she might have had a seizure ***or*** could have been a clonic phase."  (*Id.* at 3 (emphasis added).)  Thus, despite Loomis' allegations, more evidence of Plaintiff's epileptic disability than her own and her mother's statements can be found. (*Id.*) Stress is again paid to the seeming fact that "a definitive diagnosis is possible only if the patient suffers a seizure while in the doctor's office," "unlikely given how infrequently seizures [allegedly] occurred." (*Id.* at 4.) Throughout her employment, moreover, "Loomis officials also believed that Ms. Ariza suffered from epilepsy." (*Id.* at 3, 4.) To argue otherwise now "is inconsistent and odd." (*Id.* at 4.) In its concluding paragraphs, as Plaintiff did in her first attempt, (Doc. 54 at 16), this motion urges the Court not to be distracted from the ADA's "primary object": "whether the covered entities have complied with their obligations and whether discrimination occurred, not whether the individual meets the definition of disability." (*Id.* at 5 (quoting *Garner*, 834 F. Supp. 2d at 538).)


**F.      Defendant's Second Reply**

Defendant's Reply highlights how Plaintiff has seemingly ignored the implications raised

by the latest military records and mocks Plaintiff's latest tactic—that "she was dishonest due to employment"—as "disingenuous" and "dishonest." (Doc. 114 at 1.) Plaintiff's assertion is belied by the fact, Defendant continues, that she has also claimed to have revealed her disability to Defendant's district manager, who has sworn to the contrary. (*Id.* at 1–2.) Beyond this point, Defendant's Reply reiterates old points—the generally empty record and Dr. Gladney's skeptical assessment, most prominently—all of which undermine Plaintiff's deposition testimony, discredit her mother, and underscore the essential weakness of her case: "All of [P]laintiff's argument is pure unsubstantiated rhetoric, without any supporting evidence." (*Id.* at 2–4.)

## IV.   DISCUSSION

### A.   Relevant Standards

#### 1.   *Rule 56*

Within Rule 56 lies the standard applicable to Defendant's MSJ. Per Rule 56(a), summary judgment is generally appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014) (citing *id.*). Axiomatically, a court construes all facts and evidence in the light most favorable to the nonmovant. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). Nonetheless, in response to another's motion, the nonmovant cannot rely on "[c]onclusory allegations,

speculation, unsubstantiated assertions, and legalistic arguments." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "When both parties have submitted evidence of contradictory facts," *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005), a court is bound to "draw all reasonable inferences in favor of the nonmoving party" and cannot "make credibility determinations or weigh the evidence," *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); *see also Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by the substantive law," materiality "not a criterion for evaluating the evidentiary underpinning of [factual disputes]").

In utilizing Rule 56, this Court must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 9A CHARLES WRIGHT, ATHUR MILLER, *ET AL.,* FEDERAL PRACTICE AND PROCEDURE § 2529 (2d ed. 1995); *accord Latiolais v. Cravins*, 547 F. App'x 429, 433 (5th Cir. 2014) (internal quotation marks omitted) (citing *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110). In other words, although this Court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110, *cited in Havera*, 723 F.3d at 591. Under Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, neither superficial nor frivolous, factual disputes that may affect the outcome of the case under the applicable substantive law, *see Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510, and (2) so long as the nonmovant does not exclusively rely on "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence," *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.

1994), or on evidence that no tribunal could reasonably deem true and indisputable as a matter of law, *Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1345 (Fed. Cir. 2007) (quoting *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" remain, as they long have been, "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513; *see also Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1129 (5th Cir. 2014) (quoting *id.*).[4]

### 2. ADA

Adopted so as "to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities," S. REP. NO. 101-116, at 2 (1989); *see also* 42 U.S.C. § 12101(b) (listing the ADA's varies purposed, including "to provide a clear and

---

[4] Occasionally, Rule 56 has been more strictly construed in the context of employment discrimination than it has in other matters. As one appellate panel observed, "motions for summary judgment in employment discrimination cases are scrutinized more carefully because of the inherently factual nature of the inquiry and the factual standards set forth by Congress." *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1032 (8th Cir. 2005); *see also, e.g.*, *Feick v. Sivalls, Inc.*, No. 1:12-cv-107, 2014 U.S. Dist. LEXIS 359, at * 1–2, 2014 WL 29530, at *1 (D.N.D. Jan. 3, 2014) (citing *id.*); *Lizotte v. Dacotah Bank*, 677 F. Supp. 2d 1155, 1161 (D.N.D. 2010) (same). For this reason, in some courts' view, "summary judgment should seldom be used in employment-discrimination cases," appropriate in those rare cases when the record truly evidences no genuine factual dispute and demands no analysis of a witness' credibility. *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1205 (8th Cir. 1997). *But see, e.g. Bucci v. Hurd Buick Pontiac GMC Truck, LLC*, 85 A.3d 1160, 1180–81 (R.I. 2014) (Goldberg, J., concurring and dissenting in part) (discussing the problem of summary judgment in employment discrimination cases); *But see* Denny Chin, *Summary Judgment in Employment Discrimination Cases: A Judge's Perspective*, 57 N.Y.L. SCH. L. REV. 671, 672 & n. 7 (2012-13) (not quarreling with "the statistics suggesting that summary judgment is granted more often in employment cases"); Bernice B. Donald & J. Eric Pardue, *Bringing Back Reasonable Inferences: A Short, Simple Suggestion for Addressing Some Problems at the Intersection of Employment Discrimination and Summary Judgment*, 57 N.Y.L. SCH. L. REV. 749, 757–63 (2012-13) (summarizing the various factors that may explain why "federal courts can be inhospitable venues for employment discrimination plaintiffs" and arguing that a more faithful and "liberal" application of the Rule 56 standard would be "a less radical suggestion . . . that fits within the current *McDonnell Douglas* framework").

comprehensive national mandate for the elimination of discrimination against individuals with disabilities"); *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 801, 119 S. Ct. 1597, 1601, 143 L. Ed. 2d 966 (1999) (construing 42 U.S.C. § 12101(a)(8) and (9) as embodying the ADA's intent "to eliminate unwarranted discrimination against disabled individuals in order both to guarantee those individuals equal opportunity and to provide the Nation with the benefit of their consequently increased productivity"), the ADA prohibits employers from discriminating against a "qualified individual on the basis of disability" regarding numerous terms and conditions of employment, 42 U.S.C. § 12112(a); *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360–61, 121 S. Ct. 955, 960, 148 L. Ed. 2d 866 (2001). Absent direct evidence of an employer's discriminatory intent, ADA discrimination claims are evaluated under the burden-shifting framework erected in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See, e.g.*, *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 n.6 (5th Cir. 2009); *Powers v. Woodlands Religious Cmty., Inc.*, 323 F. App'x. 300, 302 (5th Cir. 2009); *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005).

In accordance with this mandatory paradigm, a plaintiff first bears the burden to establish a *prima facie* case of discrimination. *See, e.g.*, *Palmer v. Albertson's LLC*, 418 F. App'x 885 (11th Cir. 2011); *Buchsbaum v. Univ. Physicians Plan*, 55 F. App'x 40, 45 (3d Cir. 2002). To articulate such a case and thus meet his or her initial obligation for purposes of the ADA, a plaintiff must show that (1) he or she is disabled under the ADA; (2) is qualified to perform the essential functions of his or her job with or without an accommodation; and (3) was discharged or otherwise adversely affected in whole or in part because of his or her disability. *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000); *see also, e.g.*, *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 996 (8th Cir. 2014); *Richardson v. Friendly Ice Cream Corp.*, 594

F.3d 69, 74 (1st Cir. 2010).[5] A fact-intensive process, discrete provisions and precepts govern each element's analysis.

The ADA itself demarcates the first requirement, giving a specific "definition of disability." 42 U.S.C. § 12102(1); *see also Flanner v. Chase Inv. Servs. Corp.*, 600 F. App'x 914, 922 (5th Cir. 2015) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter [Equal Opportunity for Individuals with Disabilities] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." (quoting 42 U.S.C. § 12102(3)(A))). Since 2008, the ADA has expressly mandated that a court interpret its unique "definition of disability . . . in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A); *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 993 (W.D. Tex. 2011) (citing *id.* and asserting that the ADA's expanded definition of a qualified disability "was undertaken in response to court decisions that Congress felt had created an inappropriately high level of limitation necessary to obtain coverage under the ADA" (internal quotation marks omitted)).

The second element—a disabled individual only qualifies for the ADA's protection "if either with or without a reasonable accommodation, he or she can perform the essential functions of the job," *Santiago Vera v. Williams Hospitality Grp.*, 73 F. Supp. 2d 161, 166 (D.P.R. 1999) (construing 42 U.S.C. § 12111(8) (defining a "qualified individual" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires")—has been expounded in case law construing the ADA and its implementing regulations, *see, e.g., Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 194–96,

---

[5] Occasionally, the test has been divided into five parts. *See Rosebrough v. Buckeye Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012).

122 S. Ct. 681, 689–90, 151 L. Ed. 2d 615 (2001) (citing to the EEOC's regulations but observing that "no agency has been given authority to issue regulations interpreting the term 'disability' in the ADA"); *EEOC v. Res. for Human Dev., Inc.*, 827 F. Supp. 2d 688, 694 n.5 (E.D. La. Dec. 7, 2011) ("The ADA's implementing regulations are entitled to deference under *Chevron . . . .*"); *Francis v. City of Meriden*, 129 F.3d 281, 283 n.1 (2d Cir. 1997) (explaining that courts tend to "accord great deference to the EEOC's interpretation of the ADA, since it is charged with administrating the statute"), *superseded by* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008), *as recognized in Guadalupe v. City of Los Angeles*, No. CV 08-2194-AHM (JEMx), 2010 U.S. Dist. LEXIS 6597, at *8 n.3, 2010 WL 140389, at *3 n.3 (C.D. Cal. Jan. 11, 2010). Intentionally written broadly, these administrative sources "list[] three nonexclusive reasons why a job function may be considered essential: (1) the position exists for the purpose of performing the function; (2) there are a limited number of employees among whom responsibility for the function can be distributed; and/or (3) the function is highly specialized and the incumbent was hired for his or her expertise or ability to perform it." 29 C.F.R. § 1630.2(n)(2); *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001) (defining an essential function as "a fundamental job duty of the position at issue," potentially "encompass[ing] individual or idiosyncratic characteristics of the job"). To wit, the function which apparently cannot be performed must "bear more than a marginal relationship to the job at issue." *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993).

Mandatory only upon the first two's successful showing, the third prong deals with the propriety of an accommodation. For its purposes, a plaintiff must demonstrate that a proposed accommodation "would enable [him or her] to perform the essential functions of [his or her] job" and "would be feasible for the employer under the circumstances." *Tobin v. Liberty Mut. Ins.*

*Co.*, 553 F.3d 121, 136 (1st Cir. 2009); *accord, e.g.*, *Gupta v. Donahoe*, 571 F. App'x 324, 325 (5th Cir. 2014); *Tyndall v. Nat'l Educ. Ctrs. Inc. of Ca.*, 31 F.3d 209, 213 (4th Cir. 1994). The ADA even provides two non-exclusive examples of a "reasonable accommodation," including "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" or "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). As the Court has advised, "a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an 'accommodation' seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S. Ct. 1516, 1522, 152 L. Ed. 2d 589 (2002).

Upon this three-part showing, a shift occurs. Now, the defendant-employer need articulate a legitimate, non-discriminatory reason for the challenged action. *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir. 2000); *accord Khalfani v. Balfour Realty Cmtys., L.L.C.*, 595 F. App'x 363, 365 (5th Cir. 2014). If a defendant succeeds, a plaintiff must then prove this reason to be "pretextual," ineluctably invalid. *Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 362–63 (5th Cir. 2013) (citing *McDonnell Douglas Corp.*, 411 U.S. 792, 93 S. Ct. 1817).

## B.    Application to Instant Motions

To prevail under Rule 56, Defendant needs to "point[] the court to the absence of evidence to support" Plaintiff's claim. *Matlock v. City of Dallas*, No. 3:97-CV-2735-D, 1999

U.S. Dist. LEXIS 17953, at \*5, 1999 WL 1032601, at \*1 (N.D. Tex. Nov. 12, 1999). Here, the MSJ specifically targets Plaintiff's failure to establish her disability, the first element of the required *prima facie* case, and generally limits itself to marshalling evidence against this single element.[6] (Doc. 50 at 1; Doc. 51-1 at 1, 20; *see also, e.g.*, Doc. 58 at 8; Doc. 60 at 8; Doc. 63 at 8; Doc. 110 at 1, 3; Doc. 114 at 2, 5.) Restricted to this issue alone by virtue of its narrow focus, this Court denies the MSJ for three reasons, all of which reveal the presence of several genuine disputes of material fact. First, the MSJ misconstrues the relevant ADA provision. Read properly, the statute actually undercuts Defendant's argument under Rule 56 in light of its motions' concessions and inconsistencies. Second, though some of it militates against Plaintiff, much of the evidence presented by Defendant is ambiguous and even contradictory, success for either side more than conceivable. Third, enough evidence exists for a jury to find a disability so long as this Court "disregard[s]," as it must under Rule 56, "all evidence favorable to the moving party that the jury is ***not required*** to believe." *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110 (emphasis added).

### 1.    *Conflating the ADA's Definitions*

On its second page, the MSJ presents Defendant's version of the ADA. (Doc. 51-1 at 2.) "In order to have a claim under the ADA," Defendant writes, "the [P]laintiff must first prove a disability." (*Id.* (citing to § 12102(2)).) Defendant proceeds to define a disability as "(1) a mental or physical impairment that substantially limits not only major life activities of an individual, (2) a record of such impairment, ***and*** (3) being regarded as having such an impairment." (*Id.*

---

[6] Despite this overriding focus, Defendant does touch upon the second and third prongs towards the MSJ's end. (Doc. 51-1 at 17–20.) As the Court notes later, however, it too fails to carry its burden as to those elements. *See infra* Part IV.B.2–3.

(emphasis added).) Although Defendant never veers from this statutory apperception in their papers or at oral argument, the ADA promulgates a distinctly different definition. 42 U.S.C. § 12101.

The ADA does define a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 678 (5th Cir. 2013) (quoting definition). However, it goes on to define a cognizable disability not in the conjunctive, as Defendant believes, but in the disjunctive, deeming a person statutorily disabled if he or she has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; *or* (C) . . . [is] regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1) (emphasis added); *Henson v . Bell Helicopter Textron, Inc.*, 128 F. App'x 387, 391 (5th Cir. 2005) (citing definition). Grammatically and linguistically, then, Defendant is wrong when it argues that Plaintiff must have an impairment, a record of that impairment, and be regarded as having such an impairment to qualify as disabled for the ADA's purposes. (Doc. 51-2 at 2.) Rather, because the statute employs the customarily disjunctive "or," *United States v. Woods*, 134 S. Ct. 557, 567, 187 L. Ed. 2d 472 (2013), a showing of any one of those elements—an impairment, a record, or "being regarded as having an impairment"—will be sufficient to satisfy the ADA's disability denotation as a matter of law, *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 475 (5th Cir. 2006); *accord, e.g.*, *Walsh v. Bank of Am.*, 320 F. App'x 131, 132–33 (3d Cir. 2009); *Cole v. Uni-Marts, Inc.*, 88 F. Supp. 2d 67, 74 (W.D.N.Y. 1999). Allowing a plaintiff to meet the statutory meaning in the absence of a medically confirmed disability, this approach well reflects and accurately embodies

Congress' intent: "[T]he establishment of coverage under the ADA should not be overly complex nor difficult," and the ADA is "expect[ed] . . . [to] lessen the standard of establishing whether an individual has a disability for purposes of coverage under the ADA." H.R. REP. NO. 110-730, at 9 (2008);[7] *see also Chevron U.S.A. v. Echazabal*, 536 U.S. 73, 85 n.5, 122 S. Ct. 2045, 2052 n.5, 153 L. Ed. 2d 82 (2002) (discussing ADA's legislative history).

The ADA's three discrete and equally valid definitions of disability compel a particular application of Rule 56 in this case of disability discrimination: Plaintiff's case can withstand summary judgment, for Plaintiff can ultimately win, so long as the evidence that cannot be disbelieved does not definitively preclude her from later demonstrating that Defendant regarded her as disabled and acted upon this perception, whether or not her disability is "actual or perceived" or "whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A); *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 805 (5th Cir. 1997) (observing that a plaintiff need only meet one of the ADA's three three statutory definitions of disability to be deemed "disabled"); *see also Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) (same). If the Plaintiff opts for this third route, even an empty record and an absence of diagnosable disability cannot doom her ADA case; she will need only demonstrate that the Defendant perceived her alleged (and even if later disproven) disability as an "impairment." *See Bank v. Hit or Miss, Inc.*, 946 F. Supp. 569, 571 n.1 (N.D. Ill. 1996) (so concluding in spite of plaintiff's "unartful pleading," though in accordance with Rule 12(b)).[8]

---

[7] Though often disparaged, such history can be useful when it corroborates textual inferences or is unambiguous and specific. *See, e.g.*, *Johnson v. Home State Bank*, 501 U.S. 78, 86–87, 111 S. Ct. 2150, 2155, 115 L. Ed. 2d 66 (1991); McDow v. Smith, 295 B.R. 69, 78 n.18 (E.D. Va. 2003).

[8] While it is not dispositive, the legislative history explains § 12102(1)'s third prong in words that support this construction: "[I]f an employer refuses to hire [or retain] someone . . . because

Based on this statutory subsection, Defendant's MSJ cannot be granted. Rather clearly, Defendant ignores the fact that Plaintiff need not actually be disabled to win at trial. Instead, under the ADA, she need only show Defendant thought she may be so afflicted and terminated her without attempting any reasonable accommodation for that reason. *See* 42 U.S.C. § 12102(1)(C); *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 772 (6th Cir. 2011). On this score, the record can still be reasonably construed in Plaintiff's favor. As Defendant itself admits, its officials demanded Plaintiff see a neurologist and refused to return her to work until a doctor cleared her return; they thus treated Plaintiff as though she was, in fact, disabled by virtue of an epileptic condition, a condition necessitating a doctor's permission before she could again work. (Doc. 51-1 at 17–19.) Otherwise, no need for medical clearance of any kind would have been so necessary, nor would have its absence have proved so fatal. (*See id.* at 18.) Indeed, Defendant fired Plaintiff only when its chosen neurologist refused to provide clearance for her ability to wield a weapon, thereby impliedly crediting her as disabled by an epileptic disorder. Even if this inference is debatable, it is nonetheless reasonable. As such, these bare facts, undisputed by Defendant, could support a reasonable finding of disability regardless of how ambiguous Plaintiff's medical records appear to be. With this possibility, neither fanciful nor conjectural, Plaintiff's complaint can withstand the MSJ due in part to Defendant's construction of § 12102(1).

A second reason, more technical, bolsters this conclusion. In the MSJ, Defendant insists that Plaintiff must "prove" a disability" in order to have a claim under the ADA and that she has so far failed to prove the existence of her epilepsy. (Doc. 51-1 at 2.) In so arguing, Defendant confuses the distinction between the making of a *prima facie* case, as Plaintiff certainly must do,

---

of the employer's perception that the applicant had a disability which prevented the person from working, that person would be covered under the third prong." S. REP. NO. 101-116, at 24.

and the proving of such a case, which Plaintiff need not yet do. *See* Donald & Pardue, *supra*, at 762–63. To achieve the former, the record must contain some credible evidence of each requisite element; this standard is designed to weed out truly spurious cases. The record, however, need not "prove" the matter, as the making of a *prima facie* case is intended to trigger a proceeding, i.e. a trial, intended to test, i.e. prove, the evidence's veracity and cogency. In fact, if Plaintiff had proven each element of her ADA claim, she, not the Defendant, would presently be entitled to summary judgment, and this Court could just proceed to analyze the extent to which Defendant terminated Plaintiff for a legitimate reason, a distinct inquiry, *see supra* Part IV.A.2. At this point, Plaintiff is not compelled to "prove" anything, only to advance enough evidence to leave her argument viable based on a reasonable construction of the existing evidence. As shown above, Defendant inadvertently did this for her, at least in regards to one of the three definitions of disability set out in the ADA.

### 2.     *Inconsistencies in Defendant's Account*

In its every filing, Defendant asserts that no evidence exists that Plaintiff suffers from an actual disability. (Doc. 33, 42.) It cites to doctors and records, claiming none could possibly support Plaintiff's version, and concludes only two bits of evidence—Plaintiff's own words and her mother's attestations—buttress her weak case. Yet, in actuality, Defendant overlooks certain facts and discrepancies in the record that leave many questions of critical material fact unresolved.

While Gladney "specifically testified that . . . [Plaintiff] does not have a disabling condition of epilepsy/seizures" at his deposition, (Doc. 51-1 at 3; *see also, e.g.*, Doc. 110 at 1; Doc. 114 at 4), the MSJ reveals other facts that cast into doubt this very testimony. For example,

during this deposition, upon reviewing several of Plaintiff's hospitalization records, Gladney did

no more than say "I didn't hear anything that sounds like a seizure at all" and "sounds more like

a history of syncope"; he later clarified, "I would lean – I could see how this could be a

prolonged syncopal spell." (Doc. 51-1 at 11, 13.) Gladney's conclusion, which Defendant

emphasizes again and again, is thus generally coached in the most tentative of terms ("sounds

like," "I would lean," etc.). Indeed, at another point during his deposition, he even admitted, "So

many times it can be difficult and very complicated to separate" syncope from epilepsy, and

answered, "I would have no idea," in respond to counsels' query, "[W]ould Dr. Craig's opinion

that she just had these two fainting spells be a realistic diagnosis?" (Doc. 51-6 at 11, 21.) And

when asked to comment about the import of Plaintiff's sworn oath that she had never

"experienced any loss of consciousness under normal sleep," he refused to accede to Defendant's

insistent question, "So that doesn't indicate she has had seizures or any type of problems, does

it?" (*Id.* at 24, 34–35.) Compounding this testimony's ambiguity, he further explained that he

would regard Plaintiff as not disabled due to her apparently viable and successful treatment

regimen, not due to her absence of the underlying condition. (*Id.* at 24, 34–35.) Certainly, it is

hard to see how Gladney's hesitant and often equivocal language "completely disproves

[P]laintiff's allegation that she has a disability in the form of epilepsy," as Defendant insists.

(Doc 51-1 at 11.)

In addition, Gladney actually refused to take a position on the issue before the Court:

"Well, ***even if she had seizures***, which I am ***beginning*** to doubt that she does . . . ." (*Id.* at 14

(emphasis added).) True, Dr. Gladney did not testify that Plaintiff has seizures; true, he now

doubts whether she has epilepsy. (Doc. 51-1 at 13; *see also* Doc. 51-6.) But, as these excerpts

show, Gladney is not the unalloyed proponent Defendant describes. Unwilling to take a firm

stand, Gladney has proffered no evidence that, by indisputably establishing Plaintiff's non-disability, would render the existence of a genuine dispute a legal impossibility.

Gladney's testimony, moreover, is seemingly contradicted by his own treatment records. Quite clearly, Gladney did see Plaintiff, and he did in fact prescribe anti-seizure medication for Plaintiff's use, believing her to suffer from such a paralyzing condition. (Doc. 51-1 at 9–10.)  In admitting to this history, he even made a point of emphasizing how "not helpful" ER notes tend to be in alleged seizure cases. (Doc. 51-6 at 32.) At the very least, regardless of the weight of his own ambiguous statements, this fact raises issues of fact as to Plaintiff's condition and this witness' credibility. To wit, considering the indisputable fact that the tentative Dr. Gladney has offered two contradictory medical opinions about the same patient, a jury would not be required to believe his sworn testimony.

Equally damaging to Defendant's MSJ under Rule 56, Craig's testimony can be similarly challenged. Like Gladney, Craig now regards Plaintiff as having suffered a number of fainting spells but never epilepsy. (Doc. 51-1 at 15.) However, on prior occasions, Craig had diagnosed Plaintiff as suffering from "possible epilepsy," a conclusion he now insists "was not . . . diagnosis by him or his nurse." (*Id.*) Additionally, on March 6, 2014, he submitted an affidavit in which, in Defendant's words, he "state[s] that in his opinion Ariza suffers from a seizure disorder and it is under control," an affidavit he later insisted reflected Plaintiff's self-crafted history alone (*Id.* at 16.) Echoing Dr. Gladney, Dr. Craig conceded that he did not know whether Plaintiff "has epilepsy or not from . . . [his] personal treatment of her." (*Id.* at 17.) Incompatible, these varying views raise questions of fact and issues of credibility best left to a jury's deliberations.

### 3.      *Plaintiff's Bare Minimum*

Finally, Plaintiff has alleged enough to survive the MSJ. If believed, her own testimony and her mother's testimony do attest to her epileptic state. Regardless of her doctors' present positions, as the MSJ inconsistently admits and as her pharmacy record divulge, Plaintiff did receive several prescriptions for anti-seizure medication.[9] (*Id.* at 10; *see also* Doc. 51-7 at 2.) Clear and uncontroverted, offered by Defendant, this one record can and does "support[] plaintiff's claim of a disability in the form of epilepsy," a record created by Gladney's then confident, now doubtful, diagnosis. (Doc. 51-1 at 12.) Even if scanty, such medical records can satisfy Plaintiff's burden at this stage. *See EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000). Relatedly, Gladney's references to seizure activity in Plaintiff's newly questioned files as well as Craig's former diagnosis of epilepsy and the affidavit he executed on March 5, 2014, could support a similar finding. To Defendant, only these doctors' newly considered opinions matter, but a factfinder is not compelled to credit these thoughts and set aside other indicia by these same persons that Plaintiff did indeed suffer from some type of seizure condition. By any reasonable measure, there is enough evidence in the record to justify denying the present motion.

Furthermore, the fact that Defendant provided two different jobs descriptions of Plaintiff's position could nurture a jury's reasonable suspicions. Plaintiff's possible seizures seemingly render her unfit if one description is accepted, but her seizures would prove no hurdle if the other is applied. (Doc. 54 at 199, 103–04.) Even if "[i]t would not be a reasonable accommodation to require the employer to eliminate essential job functions, modify job duties,

---

[9] Further undercutting his credibility, Gladney was "surprised" when Plaintiff admitted to not taking her prescribed medication. (Doc. 51-1 at 10.) To this Court, it does not seem likely that a doctor truly unconvinced of a patient's disability would be so surprised by her failure to take inessential medication or fail to note his suspicions in a patient's written record.

reassign existing employees, or hire new employees," *Burch v. City of Nacogdoches,* 174 F.3d 615, 621 (5th Cir. 1999), the discrepancy could lead a jury to believe the gun-holding requirement upon which Defendant rested its termination decision amounts to mere subterfuge, a verboten pretext, *Chevron Phillips*, 570 F.3d at 615. Support for such a conclusion could be found in the fact that Defendant specifically delayed terminating Plaintiff until Dr. Moore made his final decision, one based on the second description proffered by Defendant's employees. Furthermore, because "[a]n employer violates the ADA when its unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee," it is unclear whether Defendant chose to ignore Plaintiff's return-to-work notes, as Plaintiff asserts, or whether "the breakdown in the interactive process . . . [was] traceable" to Plaintiff's apparent intransigence, as Defendant contends. *Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 726 (5th Cir. 2011). Finally, Defendant never answers Plaintiff's retort: that, since three employees work at the vault at any single point in time and only two of three must carry a weapon, Defendant could have allowed Plaintiff not to wear one. (Doc. 54 at 24–25.) Even if not, so as to prove its compliance with the ADA, Defendant would need to show, for example, that Plaintiff's supervisors met with her multiple times to discuss available positions for which she met the minimum requirements based on her resume, *Toronka*, 411 F. App'x at 726, or that she was ineligible for a restructured position or a vacant posting, *see* 42 U.S.C. § 12111(9). However persuasive they may later strike a jury, answers to each of these questions remain outstanding, raising issues of fact and precluding summary judgment.

## V.    CONCLUSION

Rule 56 forbids this Court from considering the ultimate weight of the evidence so long

as some supporting the movant and nonmovant can be discerned. When the MSJ, Defendant's Proposed Memorandum, and Defendant's Reply are stripped of their argumentative language and the factual issues are laid bare, it is clear that the MSJ lacks merit. Accordingly, this Court DENIES Defendant's MSJ.

Signed in Baton Rouge, Louisiana, on <u>September 23, 2015</u>.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**